**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

NATIONAL RIFLE ASSOCIATION )
OF AMERICA, )
        )
         Plaintiff, )
        )
v. )     Civil Action No.   1:18-cv-639-LO/JFA
        )
LOCKTON AFFINITY SERIES OF LOCKTON )     JURY TRIAL DEMANDED
AFFINITY, LLC, )
        )
and )
        )
KANSAS CITY SERIES OF LOCKTON )
COMPANIES, LLC, )
        )
         Defendants. )
_____ )

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

      Plaintiff National Rifle Association Of America ("NRA") files this Complaint and Jury

Demand against Defendants Lockton Affinity Series of Lockton Affinity, LLC (f/k/a Lockton Risk

Services, Inc.) ("Lockton Affinity") and Kansas City Series of Lockton Companies, LLC ("Lockton

KC"), and together with Lockton Affinity, "Lockton"), based on personal information as to its own

actions and on information and belief as to all other matters, as follows:

### I.

### PRELIMINARY STATEMENT

      This action concerns a longstanding contractual relationship between Lockton, the world's

largest privately-held insurance broker, and America's oldest civil rights organization – the NRA.

      The NRA is a marksmanship, self-defense, and constitutional rights advocacy organization –

not an insurance company.  However, like many affinity groups and associations, the NRA sought to

make life, health, and other insurance coverage available to its members on affordable, tailored terms. The NRA contracted with Lockton for this purpose.

One of the largest players in the affinity insurance market, Lockton holds itself out as a subject-matter expert and a "speciali[st] in providing insurance for franchises, nonprofits, professional organizations, trade groups, and associations."[1]  In exchange for the opportunity to earn hefty brokerage and management fees promoting its insurance offerings to the membership rolls of client organizations, Lockton represents that it will ensure all subject insurance programs comply with relevant laws and regulations, so that clients can avoid associated "headaches and complications."[2]

Lockton's agreements with the NRA are no exception; they provide that Lockton will "create, implement, and administer" NRA-endorsed insurance programs, and vest in Lockton the responsibility to maintain compliance with applicable laws and regulations.  Pursuant to those contracts, Lockton has "responsibility to ensure" that the NRA is not engaged in unlicensed insurance-marketing activities.

For more than seventeen years, the NRA performed its obligations under its agreements.  The NRA relied upon Lockton's oversight, review, and signoff with respect to insurance-related communications, products, and programs it endorsed.  Even as other membership organizations faced occasional government scrutiny over the marketing of their affinity insurance programs, the NRA's conservative approach led it to rely on Lockton's expertise to afford itself the assurance of regulatory compliance for which the NRA had bargained.

Although no material feature of any relevant insurance program managed by Lockton changed in the last two years, the political landscape has changed.  A politically connected, anti-NRA activist

---

[1] Lockton Companies, https://lockton.com/affinity-group-insurance-solutions (last visited May 3, 2018).

[2] *See id.*

organization known as Everytown for Gun Safety ("Everytown") conceived and openly orchestrated regulatory inquiries concerning NRA-endorsed insurance products marketed and administered by Lockton.  During the run-up to the New York Democratic gubernatorial primary election, the New York Department of Financial Services ("DFS") commenced an investigation of the NRA-endorsed insurance products marketed and administered by Lockton.  Not coincidentally, the investigation has coincided with public statements by Governor Andrew Cuomo, and DFS Superintendent Maria Vullo, that seek to coerce "all insurance companies and banks doing business in New York to . . . discontinue[] their arrangements with the NRA"[3] and other "gun promotion organizations."[4]

In the face of this politically motivated coercion, Lockton should have honored its fiduciary obligations and longstanding business relationship with the NRA and taken full responsibility for any compliance related concerns.  Instead, via Twitter on February 26, 2018, Lockton publicly and abruptly announced that it would cease providing services to the NRA.  Thereafter, Lockton *disavowed and rescinded its prior regulatory-compliance guidance provided to the NRA over a 17-year period, and stated the NRA should no longer rely upon Lockton's prior approvals*.  Lockton did not, however, rescind any comparable or identical insurance-marketing guidance it provided to clients who were not "gun promotion organizations."  Therefore, without any notice to the NRA, Lockton entered into a consent order with DFS that propagated misleading accusations – ascribing, to the NRA, conduct in which Lockton either engaged or approved – and adopted a host of prospective restrictions on the sale of unambiguously-lawful insurance policies to NRA members.

---

[3] *See* Press Release, Gov. Andrew Cuomo, Governor Cuomo Directs Department of Financial Services to Urge Companies to Weigh Reputational Risk of Business Ties to the NRA and Similar Organizations (Apr. 19, 2018) https://www.governor.ny.gov/news/governor-cuomo-directs-department-financial-services-urge-companies-weigh-reputational-risk.

[4] *See* Superintendent Maria Vullo, Memorandum, Guidance on Risk Management Relating to the NRA and Similar Gun Promotion Organizations, NY DEPT. FIN. SRVCS. MEMO. (Apr. 19, 2018), https://www.dfs.ny.gov/legal/dfs/DFS_Guidance_Risk_Management_NRA_Gun_Manufacturers-Insurance.pdf.

Simply put, Lockton ceased to protect the NRA and its interests.  Instead, Lockton chose to abet the DFS blacklisting campaign in order to save itself.

In an apparent effort to placate the regulators in New York, Lockton has engaged in secret communications with underwriters of relevant insurance products, which have induced those underwriters to terminate business with the NRA, its programs, and its members.

Lockton's numerous contractual breaches not only reflect a self-interested response to DFS coercion—but a complete failure by Lockton to honor its duties of loyalty, full disclosure, and honesty to the NRA.  The NRA brings this action to recover damages, to enforce Lockton's broad and unambiguous obligations, and to bring to light the mechanics and consequences of an ongoing, unconstitutional blacklisting campaign being pursued by regulatory authorities in New York.

## II.

## PARTIES

1.      Plaintiff NRA is a nonprofit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia.  Founded in 1871 by veterans of the Civil War, the NRA is America's leading provider of gun-safety and marksmanship education for both civilians and law enforcement.  The NRA has over five million members, and its programs reach many millions more.

2.      Defendant Lockton Affinity is a nonresident limited liability company organized under the laws of the State of Missouri.  Lockton Affinity is an affiliate of the Lockton Companies insurance group, and specializes in insurance brokerage and administration services designed for affinity groups, nonprofit organizations, associations, and franchises.  Lockton Affinity does business in the Commonwealth of Virginia, and maintains a registered agent therein for service of process.  Pursuant to VA. CODE ANN. § 8.01-329, Lockton Affinity may be served via its registered agent, Corporate Creations Network, Inc., at 56802 Paragon Place #410, Richmond, Virginia 23230.

3.      Defendant Lockton KC is a nonresident limited liability company organized under the laws of the State of Missouri having its principal place of business located at 444 W. 47th Street, Suite 900, Kansas City, Missouri 64112.   Lockton KC is also an affiliate of the Lockton Companies insurance group, and offers, *inter alia*, oversight and management services for insurance affinity programs.   Lockton KC does business in the Commonwealth of Virginia, but does not maintain an agent for service of process in Virginia.

### III.

### JURISDICTION AND VENUE

4.      This Court has jurisdiction in this action in accordance with 28 U.S.C. § 1332(a), because Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.      Jurisdiction over Lockton Affinity is proper in this Court pursuant to the VA. CODE ANN. § 8.01-328(A)(1) because Lockton Affinity transacts business and contracts to supply services within the Commonwealth of Virginia, and Lockton Affinity has or exceeds sufficient minimum contacts with the Commonwealth of Virginia.

6.      Jurisdiction over Lockton KC is also proper in this Court pursuant to VA. CODE ANN. § 8.01-328(A)(1) because Lockton KC transacts business and contracts to supply services within the Commonwealth of Virginia, and Lockton KC has or exceeds sufficient minimum contacts with the Commonwealth of Virginia.

7.      Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(b)(2) because a substantial number of the events or omissions giving rise to the claim occurred in this judicial district.

8.      Additionally, jurisdiction and venue are proper in this Court because Lockton Affinity and Lockton KC have each expressly consented in the agreements at issue to exclusive jurisdiction

and venue in the courts sitting within Virginia, and waived any objection to venue in Fairfax County, Virginia regarding the matters presented herein.

**IV.**

**FACTUAL BACKGROUND**

A.      **The National Rifle Association: A Constitutional Rights Advocate**

9.      The NRA was founded in 1871 by two Civil War veterans, and established its first marksmanship-practice ground on Long Island.  Since its inception, the NRA and its members have made numerous valuable contributions to the United States.  For example, during World War II, the NRA opened its firing ranges to the government, developed training materials, and mobilized members to serve as factory and home guards.  After the war, President Truman expressed the nation's gratitude for the NRA's contributions, which he described as having materially aided the war effort.[5]

10.      Later, the NRA, in conjunction with the State of New York, established the first safety-education program for hunters.  These courses are today taught by state fish and game departments across the country and in Canada, and help make hunting one of the safest participation sports.  And since the establishment of the NRA's Eddie Eagle GunSafe Program in 1988, more than 30 million pre-kindergarten to fourth grade children have learned that if they see a firearm in an unsupervised situation, they should "STOP. DON'T TOUCH. RUN AWAY. TELL A GROWNUP."

11.      In addition to firearms-safety education and training, an important component of the NRA is political speech.  The organization is widely recognized as America's foremost defender of the Second Amendment to the United States Constitution.

---

[5] *See* Letter from Harry Truman, to C.B. Lister, Secretary-Treasurer, National Rifle Association (Nov. 19, 1945) (reprinted in Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency, S. Comm. on the Judiciary, 90th Cong. 484 (1967)).

12.     Today, the NRA has over five million members.  Like numerous affinity groups and organizations nationwide, the NRA seeks to make available to its members affordable insurance coverage tailored to their lifestyle and needs.  To this end, the NRA has contracted with insurance-industry professionals to develop, underwrite, review, administer, and market relevant insurance products to NRA members in compliance with applicable laws and regulations.  Beginning in 2000, the NRA contracted with Lockton for many of these services.

**B.      Lockton: Self-Proclaimed Insurance Experts**

13.     Lockton Affinity, and its affiliate Lockton KC (collectively "Lockton"), hold themselves out as experts in the design, oversight, and implementation of affinity-group insurance programs.  Lockton touts 29-years of experience providing "all-encompassing member insurance program[s]" to affinity groups with millions of members,[6] and claims specific expertise with respect to the insurance needs of "common-cause groups" such as the NRA.[7]  Lockton assures its clients that it will handle all of the "headaches and complications" associated with "tailoring, implementing, and managing"[8] affinity-group insurance programs in all states, including New York, making coverage—and regulatory compliance—"easy."[9]  In addition to common-cause groups like the NRA, Lockton provides affinity-insurance services to an array of industries and clients including franchises, professional and trade organizations, financial institutions, fraternal organizations, and healthcare entities.

14.     Lockton is the world's largest privately-owned insurance broker with global revenues reportedly exceeding $1.4 billion.  It also claims to be one of the nation's leading insurance-program

---

[6] https://www.lockton.com/affinity-group-insurance-solutions

[7] *Id.*

[8] *Id.*

[9] *Id.*

administrators, managing insurance solutions for groups of sizes ranging from 100 members to millions of members.

     15.      One such organization is the NRA.

**C.**    **NRA Member Insurance Programs**

     16.      In or about January 2000, the NRA contracted with multiple insurance-industry firms and professionals, including Lockton, to create affinity insurance programs which provide life, health, property, casualty, and other similar types of insurance to NRA members, as well as club and business affiliates (the "Insurance Program"). Lockton does not actually underwrite any of the coverage provided under the Insurance Program. Instead, Lockton was contracted in two specific capacities: (i) as a broker and marketer for the Insurance Program, charged with promoting insurance coverage and products to NRA members, then liaising with insurers to deliver the benefits sold; and (ii) as a program manager, charged with administering and overseeing brokerage and other activities. In both capacities collectively, Lockton has reaped tens of millions of dollars in compensation as it facilitated the sale of insurance products to NRA members.

     17.      Given the highly regulated nature of the insurance industry, it is customary for entities such as the NRA to rely on licensed brokers, program managers, and experts like Lockton to design and operate affinity programs to ensure compliance with applicable law. Over the course of the parties' nearly twenty-year relationship, the NRA entered into multiple agreements with Lockton that set forth extensive assurances by Lockton regarding its compliance obligations. The agreements giving rise to this dispute were executed in 2011, and impose substantial compliance obligations on Lockton in its broker and its program-manager capacities. It was the intent of the parties that these contracts effect and memorialize the NRA's special confidence and trust in its fiduciary, Lockton.

1. **Lockton's Program-Design and Marketing Obligations: The Insurance Program Agreement**

18.     In or about January 2011, Lockton Affinity (at the time known as Lockton Risk Services, Inc.) and the NRA entered into an Amended and Restated Insurance Program Agreement (the "Insurance Program Agreement").  The agreement took effect January 1, 2011.  Although Lockton has materially breached the Insurance Program Agreement (as detailed below), neither party has terminated it, and the contract extends through December 31, 2024.

19.     Under the Insurance Program Agreement, Lockton Affinity agrees to "create, introduce, market, offer, deliver, manage, maintain, and administer in all respects" a full range of existing and potential future insurance products "intended to meet the needs of the Client's members."  Lockton assumes extensive responsibility for marketing and communications regarding insurance; among other things, it was to "develop, design and distribute *all* promotional materials" with respect to the Insurance Program,[10] and ensure the compliance of those materials with applicable law.

20.     To induce the NRA to entrust it with such crucial functions, Lockton made representations and promises regarding its ability to safeguard the NRA's interests.  For example, Lockton Affinity represented and warranted to the NRA that it is "an expert in insurance matters".[11]  Lockton "acknowledge[d] that [the NRA] has relied and may rely upon [Lockton's] recommendations."[12]  In addition, Lockton Affinity promised that in dealings regarding the Insurance Program, it would "protect the [NRA's] interests" and indemnify the NRA.[13]

---

[10] *Id.* (emphasis added).

[11] Insurance Program Agreement Section IV.D.

[12] Insurance Program Agreement Section I.D.1.

[13] Insurance Program Agreement Section I.D.2.

21.     Notably, Lockton Affinity also represented and agreed that Lockton "shall take all reasonable measures to ensure that all aspects of the [Insurance] Program are in compliance with all applicable law and regulation," and further represented, warranted, and agreed that Lockton Affinity "is responsible for such compliance regardless of any approval or non-approval by the [NRA]…."[14]

22.     Not only did Lockton Affinity agree to indemnify the NRA for the consequences of its own potential failure to perform—it promised to pursue indemnification agreements from all insurance carriers underwriting the Insurance Program.[15]  This, of course, was particularly important given the broad and complex regulatory framework applicable to the insurance industry.

23.     In consideration for the above-described promises, the NRA agreed to permit Lockton Affinity to make use of the NRA's valuable trademarks, logos, and membership list in order to market NRA-endorsed insurance products to NRA members.  Had the NRA known that Lockton Affinity would breach its contractual and fiduciary duties of care, loyalty, good faith, and full disclosure—by, among other things, abetting a politically motivated effort to deprive NRA members of insurance coverage—the NRA never would have trusted Lockton with access to its members under its imprimatur.  Over the course of the relationship, Lockton collected tens of millions of dollars in brokerage commissions based on its promotion of Lockton-designed insurance to NRA members.

## 2.     Lockton's Oversight And Management Obligations: The Management Agreement

24.     In addition to the obligations set forth in the Insurance Program Agreement, Lockton undertook additional oversight and managerial obligations with respect to the Insurance Program pursuant to an Insurance Consulting and Programs Management Agreement (the "Management Agreement") executed by the NRA and Lockton KC on or about April 7, 2011.  Like the Insurance Program Agreement, the Management Agreement extends through December 31, 2024.

---

[14] Insurance Program Agreement Section I.G.5.

[15] *See* Insurance Program Agreement Section I.F.

25.     The Management Agreement requires Lockton KC to "oversee and manage the activities and performance" of all brokers involved in the Insurance Program, including Lockton KC's affiliate, Lockton Affinity, as well as to "oversee the Programs" generally.[16]  Like the Insurance Program Agreement, the Management Agreement emphasizes that Lockton is "an expert in all matters necessary" to perform its duties, and "acknowledges that [the NRA] has and may rely upon Lockton's advice[.]"[17]

26.     In addition to Lockton Affinity's responsibility for promoting and marketing relevant Insurance Program offerings (undertaken pursuant to the Insurance Program Agreement), the Management Agreement imposes an additional layer of responsibility on Lockton KC with respect to marketing.  Among other things, the Management Agreement makes Lockton "responsible for oversight and reporting on all Program marketing," and entrusts it to direct the development, design, and distribution of "all promotional materials with respect to the Program" by insurance brokers.

27.     Moreover, the Management Agreement clearly provides that even if the NRA approves the use of certain promotional materials, Lockton KC is responsible for ensuring that the NRA is not misperceived to be engaging in unlicensed insurance-industry activities.

28.     In addition to indemnifying the NRA for its own potential errors or failures, Lockton KC is obligated to obtain additional indemnity agreements from all insurance carriers and brokers involved in the Insurance Program.[18]

29.     Under the Management Agreement, Lockton KC agrees to direct insurance carriers and brokers to create, introduce, deliver and manage new affinity insurance products for NRA members.   Lockton KC further agrees that the Insurance Program will include a wide variety of life

---

[16] Management Agreement Section I.A.

[17] Management Agreement Section I.C.1.a.

[18] Management Agreement Section I.D.5.

and health insurance products, as well as property and casualty insurance products.  In entering the Management Agreement, Lockton KC specifically acknowledged that as Program Manager it recommended and advised that its affiliate, Lockton Affinity, should be utilized, exclusively, by NRA as broker of property and casualty insurance products for the Insurance Program.

30.     In the event of any oversight or management failure by a program broker, including Lockton Affinity, Lockton KC agrees to fulfill and rectify the oversight and management duties, and report such matters to the NRA, along with recommendations for replacement brokers.

31.     In such an instance, Lockton KC agrees to assume full responsibility to manage and oversee the Insurance Program and all affinity relationships.  Furthermore, Lockton KC agrees it is responsible to the NRA for any problems that arise from an act or omission by Lockton, and broadly agrees to hold harmless and indemnify the NRA for any acts or omissions, or material breaches of its obligations to the NRA.[19]

32.     Lockton KC is specifically charged with overseeing and working with all brokers, and agrees to "review regularly and report to [NRA] on all aspects of the [Insurance] Program" to ensure compliance with all applicable laws and regulations.[20]  Lockton KC must also recommend changes to the Insurance Program it deems desirable, and in the best interest of the NRA.[21]

33.     As for Insurance Program documents and records, Lockton KC agreed and was required to maintain records regarding the program.  All documents, books, and records provided to Lockton KC, as well as all Lockton KC's own documents, books, and records pertaining to the NRA, its members, or the Insurance Program are all required to remain open for inspection by the NRA at all reasonable times.[22]

---

[19] Management Agreement Section I.C.1.d.

[20] Management Agreement Section I.E.5.

[21] Management Agreement Section I.C.1.d.

[22] Management Agreement Section I.E.9.

34.     For performing its duties and obligations, Lockton KC is entitled to a substantial fee. At all material times, the fee has been paid to Lockton KC in accordance with the terms of the Management Agreement.

**D.     Lockton's Development And Promotion Of Carry Guard Self-Defense Insurance**

**1.     The Development Of Carry Guard: A Firearms Training and Coverage Program**

35.     In late 2016, in response to increasing demand for such a service, the NRA developed a membership program focused on self-defense training that would eventually become known as Carry Guard.  Aimed at civilians desiring to responsibly and competently carry a firearm "in life, not at the range," NRA Carry Guard provides training and education resources—including in-person classes, seminars, and written materials—that provide guidance and instruction on proficient, lawful self-defense.

36.     As a complement to Carry Guard training, Lockton oversaw the development and marketing of a self-defense insurance product, branded Carry Guard.   Like many insurance policies (and insurance products with self-defense components), the Carry Guard insurance program provides coverage for costs or losses arising out of the lawful use of a legally possessed firearm, including for any act classified under applicable state law as justifiable self-defense.

37.     On April 27, 2017, the NRA issued a press release announcing the debut of Carry Guard, which provides program members with best-in-class training for those who carry a gun.  The release stated that the insurance benefits of the program would be administered by Lockton Affinity. As with other communications marketing Carry Guard, the press release was reviewed by both Lockton and Chubb[23] before dissemination.

---

[23] Illinois Union Insurance Company ("Illinois Union"), a subsidiary of Chubb Ltd., underwrote Carry Guard while doing business under the name "Chubb."

2.    **The NRA Relies On Lockton To Approve Marketing Materials And Ensure Compliance with State Laws.**

38.    As discussed above, Lockton is responsible for management and administration of NRA insurance affinity products, and is obligated to develop and review marketing materials to ensure that all aspects of the Insurance Program comply with applicable laws and regulations.  As a subject-matter expert, Lockton represents and warrants that the NRA may rely on its advice and approvals.

39.    The NRA is entitled to rely, and has relied, on Lockton with respect to the Carry Guard program.

40.    Significantly, in describing the diligence and approvals provided and obtained by Lockton regarding Carry Guard, by email to the NRA dated April 21, 2017, Lockton Affinity's CEO, Steven Eginoire, provided numerous assurances, including the following:

- "Our objective was to create a product that was unique in the market allowing NRA to offer a true insurance policy that protects members for a wide range of firearms related exposures, including acts of self-defense."

- "Using Lockton's product development resources, outside claim counsel, plus the coverage counsel at both Chubb and certain underwriters at Lloyd's, we developed a single policy form that provides the following coverages. . ."

- "The new CG Policy was approved by Chubb and Lloyd's."

- "We have taken all the necessary steps to make certain we maintain our compliance with the appropriate state insurance regulations and that no non-licensed entity (InfoCision, NRA) is involved in any direct communication with anyone on insurance related matters or questions."

- "As further insulation for NRA, the Lockton/NRA agreement includes specific indemnification language to protect NRA should Lockton fail to comply with any state insurance requirement."

41.    To ensure that it continued to receive the benefit of the expertise and "insulation" which Lockton contracted to provide, the NRA sought and obtained Lockton's preapproval for marketing communications and website content pertaining to Carry Guard.  Throughout the life of

the Carry Guard program, the NRA sought Lockton's prior involvement and sign-off for public-facing insurance-related communications.

42.     For example, Lockton was deeply involved with, and comprehensively approved, the following types of communications and solicitations:

43.     *Email Marketing.* On May 10, 2017, Lockton informed the NRA it approved marketing email communications the NRA planned to send regarding Carry Guard, writing "[w]e feel they are ready to go."  In reliance on Lockton's approval, the NRA authorized distribution of the email.  This process was undertaken before the NRA authorized the release of Carry Guard marketing emails, or other marketing materials.

44.     *Telephonic Communications*. In addition to email communications, the NRA relied on Lockton with respect to all aspects of telephonic marketing and interfacing with members or policyholders regarding insurance matters.  Lockton approved call-center scripts pertaining to Carry Guard, as well as all revisions thereto.

45.     *Training Videos*.  Although most of the video content produced in connection with Carry Guard pertained to self-defense techniques rather than insurance, the NRA nonetheless sought, obtained, and relied upon Lockton's approval before distributing videos.   The NRA did this to ensure that any aspect of the videos that could be construed to promote co-branded insurance coverage complied fully with relevant law.

46.     *Marketing Mailers and Websites*. In addition, the NRA relied on Lockton's expertise with respect to hard-copy mailers, and placements in NRA magazines.  Significantly, the NRA further relied on Lockton to utilize its expertise in reviewing and approving website content, including for the Carry Guard insurance website as well as the NRA's own website.

47.     At all times prior to October 2017, Lockton affirmed that, in its expert assessment, Carry Guard related communications complied with applicable insurance regulations.

E.      **Compliance Defects In The Marketing Of Carry Guard Give The NRA's Political Opponents an Opportunity to Harm the Organization and Its Members.**

48.     On October 24, 2017, *The Wall Street Journal* reported that the New York Department of Financial Services ("DFS") commenced an investigation (the "DFS Investigation") of NRA-endorsed insurance products marketed and administered by Lockton – specifically, Carry Guard insurance.  The focus of the inquiry was whether such insurance was improperly promoted or marketed.  The politically motivated nature of the DFS Investigation was obvious from the start, as the *Wall Street Journal* received notice of the inquiry before the NRA.

49.     In fact, the DFS Investigation was not the brainchild of the agency executing it. Instead, a non-governmental activist organization known as Everytown for Gun Safety ("Everytown") immediately took credit for the "investigation," explaining that it conducted its own "investigation and legal analysis" of Carry Guard which it "shared" with law enforcement and regulators in New York and elsewhere.[24]

50.     Founded by Michael Bloomberg with a $50 million endowment in 2014, Everytown's explicit political mission is to oppose the NRA.[25]  Under Bloomberg's leadership, Everytown has worked with sympathetic corporate and government officials in an attempt to interfere with access to banks and financial institutions by gun purchasers and gun supporters.  That Everytown would seek to prompt DFS scrutiny of insurance companies doing business with the NRA is unsurprising, and consistent with Everytown's agenda and tactics.

51.     Facing a primary challenge, New York Governor Andrew Cuomo viewed the polarized public gun-control debate as an opportunity to gain political ground.  Therefore, he and

---

[24] Press Release, Everytown for Gun Safety & Moms Demand Action, Everytown, Moms Demand Action Statements Responding to Report That New York Department of Financial Services is Investigating NRA Carry Guard Insurance (Oct. 25, 2017) https://momsdemandaction.org/everytown-moms-demand-action-statements-responding-to-report-that-new-york-department-of-financial-services-is-investigating-nra-carry-guard-insurance.

[25] Aaron Blake, Bloomberg Launches New $50 Million Gun Control Effort, WASHINGTON POST, Apr. 16, 2014 (explaining that Everytown "will attempt to combat the vast influence of the National Rifle Association[.]").

DFS Superintendent Maria Vullo accepted Everytown's invitation to collaterally attack the NRA by scrutinizing its insurance partners.  Moreover, through backroom exhortations as well as public statements, Cuomo, Vullo, and others connected to the Cuomo administration have made clear that "all banks and insurance companies doing business in New York" are "urge[d] to . . . discontinue[] their arrangements with the NRA"[26] or other "gun promotion organizations,"[27] under implicit threat of adverse action by DFS.

**F.**     **Troubled Waters: The NRA Allows Lockton To Take The Lead Vis-à-Vis DFS**

52.     On or about October 24, 2017, Lockton received a subpoena from the DFS in connection with its Carry Guard inquiry.  The NRA received a contemporaneous subpoena pertaining to the same issues.   As the subject-matter expert charged with ensuring regulatory compliance for Carry Guard—and as the NRA's trusted fiduciary—Lockton took the lead in response to the DFS inquiry.  Relying on Lockton's adherence to its duties of loyalty, good faith, transparency and honesty-in-fact, the NRA never requested an audience with DFS, never sought a second opinion to verify Lockton's regulatory-compliance advice, and made no changes to its insurance-related communications.  Instead, the NRA gathered documents to satisfy its own subpoena obligations and awaited further guidance from Lockton.

53.     During December 2017, Lockton executives met with the NRA and stated that specific changes should be made to the NRA Carry Guard website and that Carry Guard should be discontinued in the State of New York.  Lockton did not purport to reconcile these new directives with any of its prior, diametrically opposed guidance. (*e.g.*, that "all necessary steps" had been taken to make state-regulatory compliance "certain").  Nor did Lockton identify any facts about Carry Guard's marketing, or details of applicable regulations, which had changed since April of that

---

[26] *See supra* note 3.

[27] *See supra* note 4.

year.  Nonetheless, the NRA swiftly implemented Lockton's recommendations.  At no time prior to March 2018 did Lockton make any disclosure whatsoever concerning potential defects in its guidance—or potential regulatory scrutiny—affecting programs other than Carry Guard.

**G.**     **Lockton Breaches Its Fiduciary Duties And Other Contractual Obligations**

54.     Unbeknownst to the NRA, Lockton had ceased to protect the NRA's interests or adhere to related terms of the parties' contracts.  Instead, during or about Fall 2017, Lockton began to covertly pursue a resolution with DFS that would preserve its own business interests, to the detriment of the NRA and its members.  Lockton not only concealed its settlement posture from its client, but also surreptitiously undertook communications with insurance underwriters that had the effect of inducing them to cease offering insurance products previously included in the Insurance Program.

55.     On February 26, 2018, without warning, Lockton publicly tweeted that "Lockton Affinity has notified the NRA that it will discontinue providing brokerage services for NRA-endorsed insurance programs under the terms of its contract."  In actuality, the NRA received no prior notice of this development from its purported fiduciary.  Although Lockton later insisted the tweet was unauthorized, Lockton never retracted or corrected it—and Lockton's subsequent conduct revealed that it had repudiated and abandoned its obligations under its contracts.

56.     Also in February 2018, the Insurance Journal reported that Chubb had "joined a list of companies that are halting business deals" with the NRA; specifically, Chubb stated that it would "discontinue [its] participation in the NRA Carry Guard insurance program[.]"  Chubb has not publicly revealed the reasons for its decision.

57.     Citing Lockton's obligation to liaise with insurance underwriters in the NRA's best interests—the NRA asked Lockton for copies of pertinent communications between itself and Chubb.  Lockton flatly refused to disclose those communications.

58.     In April 2018, without prior notice, Lockton surprised the NRA by stating that another Insurance Program underwriter, Lloyd's of London ("Lloyd's"), would likewise cease to offer the NRA Insurance Program affinity policies in New York, and would decline to renew the NRA club or affiliate business policies nationwide.  Importantly, Lloyd's never underwrote the particular program that was the purported focus of the DFS inquiry: Carry Guard.  Despite its professed expertise and fiduciary obligations, Lockton failed to disclose to the NRA, prior to Lloyd's termination, that there exists any potential compliance defects or exposure with respect to affinity programs other than Carry Guard.

59.     The NRA later learned that, as with Chubb, Lockton engaged in communications with Lloyd's which it refuses to disclose, despite its fiduciary and other contractual duties.  Lockton has likewise failed to make any effort to arrange replacement carriers for the terminated policies, despite its obligation to do so.

**H.     The Coup de Grâce: Lockton Rescinds Its Regulatory Guidance, Settles With DFS, and Agrees to Abandon the NRA And Its Members.**

60.     As if the foregoing were not bad enough, Lockton soon proceeded to *withdraw its prior regulatory guidance* for which the NRA bargained pursuant to its contracts.  Specifically, Lockton has advised the NRA that it may no longer rely on any of the prior compliance approvals Lockton granted.

61.     Accordingly, by its own admission, Lockton either chronically and constantly breached its duties and obligation to provide reliable expert advice—or, in the alternative, has disavowed valid advice in an effort to appease regulators whose real target is the NRA.  In either case, it became clear that Lockton Affinity and Lockton KC have breached or repudiated fundamental obligations under the Insurance Program Agreement and Management Agreement, respectively.  However, the clearest evidence to date of Lockton's betrayal followed shortly thereafter.

62.     On May 2, 2018, the DFS and Lockton jointly publicized a consent order (the "Consent Order") that Lockton secretly negotiated.   Although it assesses numerous violations attributable to Lockton,[28] the Consent Order misleadingly purports to ascribe, to the NRA, insurance-marketing activities for which Lockton was solely responsible and which Lockton directed or approved.[29]

63.     Consistent with the broad, political aims of the DFS leadership, Lockton not only consents to cease its involvement with Carry Guard—it also agrees to restrictions affecting a host of other "NRA-related insurance policies"[30] that have never been alleged to violate any law or regulation.   For example, pursuant to the Consent Order, an ordinary property, casualty, or life insurance policy that could generally be marketed by Lockton in New York State becomes unlawful if endorsed by the NRA to NRA members.[31]   Despite its contractual duty to make full and fair disclosure to the NRA of material facts implicating the Insurance Program, and to "protect [the NRA's] interests," Lockton never disclosed to the NRA (prior to the publication of the Consent Order) that it acceded to such material breaches of the Insurance Program Agreement and the Management Agreement.

64.     Moreover, although it knew prior to the publication of the Consent Order, that its failure to obtain additional insurer declinations when placing excess-line coverage created risks for the NRA regarding insurance products within the Insurance Program.   Lockton never disclosed those risks.

---

[28] *See, e.g.*, Consent Order ¶ 30.

[29] *See, e.g.*, Consent Order ¶ 14 (chiding the NRA for "aggressive marketing" activities, but listing communications that were coordinated through and approved by Lockton).

[30] *See, e.g.*, Consent Order ¶ 36 (requiring Lockton to take steps to  "effect . . . cancellation" of any "NRA-related insurance policies" that provide coverage for "legal services"); ¶ 43 ("Lockton agrees that it shall not enter into *any agreement or program with the NRA* to participate in *any* affinity-type insurance program involving any line of insurance to be issued or delivered in New York State, or to anyone known to Lockton to be a New York resident).

[31] *See* Consent Order ¶ 43.

I.     **The Damage Done**

65.     As a direct result of the actions by Lockton in breach of its duties and obligations, as discussed above, the NRA has suffered tens of millions of dollars in damages which it seeks to recover from Lockton.  This includes, without limitation, damages due to reputational harm, lost goodwill, lost Insurance Program development and marketing costs, lost royalty amounts owed to the NRA by Lockton, and costs and expenses incurred in connection with regulatory investigations based on assertions of violation of insurance law, as well as attorneys' fees, legal expenses, and other costs.

## V.

## DEMAND FOR JURY TRIAL

66.     Plaintiff hereby demands a trial by jury regarding all issues of fact in this case.

## VI.

## CLAIMS FOR RELIEF

A.     **Breach Of Contract (As To Lockton Affinity).**

67.     Plaintiff repeats and re-alleges each and every allegation in the foregoing paragraphs as though fully set forth herein.

68.     The Insurance Program Agreement between the NRA and Lockton Affinity is a valid and binding agreement.  At all material times, the NRA performed in accordance with the agreement, and has satisfied all conditions precedent to asserting this claim.

69.     As detailed above, pursuant to the terms of the Insurance Program Agreement, Lockton Affinity owes numerous duties and obligations to the NRA.  Notably, Lockton Affinity's relationship to the NRA is one of trust and confidence, in which Lockton Affinity is obligated and bound to act in good faith and with due regard for the interests of the NRA.  Accordingly, Lockton Affinity owes the NRA fiduciary duties, which include the duties of loyalty, care, honesty in fact, and to proactively make full disclosure of all material facts.

70.     Among other things, Lockton Affinity is required to "create, introduce, market, offer, deliver, manage, maintain, and administer in all respects" a full range of existing and potential future insurance products that would meet the needs of NRA members.  In doing so, Lockton Affinity assumed extensive responsibility for marketing and communications regarding insurance; among other things, it would ensure the compliance of the same with applicable law for the Insurance Program.

71.     Lockton Affinity is required to prepare an annual marketing plan. Furthermore, Lockton Affinity is required to protect the NRA from any misperceptions regarding the role of the [NRA] in connection with the Insurance Program.  Additionally, Lockton Affinity agreed to undertake to obtain indemnification agreements for the NRA from all insurance carriers Lockton Affinity worked with in the Insurance Program, and to protect the NRA's best interests.

72.     In entering the Insurance Program Agreement, and to induce the NRA to do so, and entrust it with such crucial functions, Lockton Affinity also made emphatic representations and promises regarding its ability and intention to safeguard the NRA's interests.  For example, Lockton Affinity represents and warrants to the NRA that it is "an expert in insurance matters" and has been "hired as an expert;" Lockton Affinity, therefore, "acknowledge[s] that [the NRA] has relied and may rely upon [Lockton's] recommendations."   In addition, Lockton Affinity covenants that in dealings regarding the Insurance Program, it will "protect the [NRA's] interests" and indemnify the NRA.

73.     Notably, Lockton Affinity also represents and agrees that Lockton "shall take all reasonable measures to ensure that all aspects of the [Insurance] Program are in compliance with all applicable law and regulation," and further represents, warrants, and agrees that Lockton Affinity "is responsible for such compliance regardless of any approval or non-approval by the [NRA]…"

74.     Not only did Lockton Affinity agree to indemnify the NRA for the consequences of its own potential failure to perform—it promised to obtain additional indemnification agreements

from all insurance carriers underwriting the Insurance Program.   This, of course, is important given the broad and complex regulatory framework applicable to the insurance industry.

75.     Lockton Affinity repeatedly breached and otherwise failed to fulfill its duties and obligations to the NRA.  This includes breaches of its fiduciary duties including the duties of loyalty and to act in the best interest of the NRA.

76.     Although Lockton Affinity promised and represented that it would ensure, and that it took all necessary steps to ensure, that the Insurance Program and Carry Guard were in compliance with all applicable state regulatory laws, in actuality Lockton Affinity failed to do so.  NRA, Lockton, and the Insurance Program are now currently involved in state regulatory agency scrutiny in multiple jurisdictions, and are facing contentions and findings that the NRA has violated applicable insurance laws and regulations based on actions recommended and approved by Lockton Affinity.

77.     Rather than acting to defend the NRA, and actively advocate to protect its interests, Lockton Affinity breached its duties by, among other things, putting its own interests ahead of the NRA and proceeding to pursue and negotiate a settlement with DFS to protect itself.  It did so without full disclosure of material facts to the NRA, and irrespective of the detrimental impacts and effect of its undisclosed agreement on the NRA, its members, and the Insurance Program.

78.     On February 26, 2018, Lockton publicly tweeted that "Lockton Affinity has notified the NRA that it will discontinue providing brokerage services for NRA-endorsed insurance programs under the terms of its contract."  Thereafter, Lockton Affinity continues to refuse to disclose all material facts concerning regulatory inquiries with state insurance regulators, or settlements it was negotiating on behalf of itself.

79.     Lockton Affinity also breached its duties by refusing to provide other basic information regarding the NRA and the Insurance Program despite its obligation to do so.  Among other things, Lockton Affinity refuses to provide its communications with insurance carriers

regarding the Insurance Program, including any requests by Lockton for indemnification of the NRA, or discussions or decisions or by carriers about terminating or not renewing NRA member insurance policies. Lockton Affinity further refuses to reveal its internal discussions about the Insurance Program or its prior advice and approvals to the NRA. In addition, other than Lockton Affinity's communications with the NRA directly, Lockton Affinity refuses to disclose its communications with any other person or entity about the NRA or matters related to the Insurance Program, including those Lockton already produced to government regulators.

80.     Lockton Affinity also failed to comply with its contractual obligations and protect the best interests of the NRA by not undertaking to obtain indemnification agreements for the NRA from insurance carriers, as required.

81.     In addition to the foregoing, after specifically acknowledging it previously reviewed and approved prior Insurance Program marketing materials, Lockton Affinity also breached its duties and obligations by now purporting to renounce its previous compliance guidance and directives, and stating that the NRA may not rely on anything previously approved by Lockton Affinity.

82.     Lockton Affinity also breached its duties and obligations by failing and refusing to timely advise the NRA and provide direction regarding compliance matters following negotiations and agreements by Lockton Affinity with regulators. Lockton Affinity then proceeded to enter into the Consent Order, which contains misleading, detrimental statements pertaining to the NRA and agrees to multiple restrictions which impair the NRA's interests, even with respect to insurance programs never alleged to violate any law or regulation. Lockton Affinity also ceased making royalty payments to the NRA.

83.     As a direct result of Lockton Affinity's breaches of its duties and obligations to the NRA, and other wrongful conduct, the NRA has suffered damages and losses, including attorneys' fees and expenses, which it is entitled to recover in an amount to be determined by the trier of fact.

**B.**    **Count 2: Breach Of Contract (As To Lockton KC).**

84.    Plaintiff repeats and re-alleges each and every allegation in the foregoing paragraphs as though fully set forth herein.

85.    The Management Agreement between the NRA and Lockton KC is a valid and binding agreement, pursuant to which Lockton KC comprehensively manages and administers the Insurance Program for the NRA, its members and their families.  At all material times, the NRA performed in accordance with the agreement, and satisfied all conditions precedent to asserting this claim.

86.    Pursuant to the terms of the Management Agreement, Lockton KC owes numerous duties and obligations to the NRA.  As with its affiliate, Lockton KC's relationship to the NRA is also one of trust and confidence, in which Lockton KC is obligated and bound to act in good faith and with due regard for the interests of the NRA.  Accordingly, Lockton KC owes the NRA fiduciary duties, which include the duties of loyalty, care, honesty in fact, and to proactively make full disclosure of all material facts.

87.    The Management Agreement requires Lockton KC to "oversee and manage the activities and performance" of all brokers involved in the Insurance Program, including Lockton KC's affiliate, Lockton Affinity, as well as to "oversee the Programs" generally.[32]  The Management Agreement emphasizes that Lockton is "an expert in all matters necessary" to perform its duties, and "acknowledges that [the NRA] has and may rely upon Lockton's advice[.]"[33]

88.    Lockton is also "responsible for oversight and reporting on all Program marketing," and is entrusted to direct the development, design, and distribution of "all promotional materials with respect to the Program" by insurance brokers.

---

[32] Management Agreement Section I.A.

[33] Management Agreement Section I.C.1.a.

89.     Moreover, the Management Agreement provides clearly that even if the NRA approves the use of certain promotional materials, Lockton is responsible for ensuring that the NRA is not misconstrued to be acting as an unlicensed marketer of insurance products.  Specifically:

> "Regardless of any approval by the [NRA] or other entity, in the event that any type of claim for any type of remedy is made against the [NRA] asserting that the [NRA] should be held liable as though it was an insurer, or based on a perception that the [NRA] is an insurer, Lockton is strictly liable to defend, hold harmless and indemnify the [NRA]."

90.     Lockton KC is also obligated to undertake to obtain additional indemnity agreements from all insurance carriers and brokers involved in the Insurance Program, in addition to indemnifying the NRA for its own potential errors or failures.

91.     Furthermore, Lockton KC agrees it is ultimately responsible to the NRA for any problems that may arise from an act or omission by Lockton, and broadly agrees to hold harmless and indemnify the NRA for any acts or omissions, or material breaches of its obligations to the NRA.

92.     Lockton KC is specifically charged with overseeing and working with all brokers, and agrees to "review regularly and report to [NRA] on all aspects of the [Insurance] Program to for compliance with all applicable laws and regulations."   Lockton KC also has a duty to recommend changes to the Insurance Program that it deems to be desirable, and in the best interest of the NRA.

93.     Lockton KC repeatedly breached and otherwise failed to fulfill its duties and obligations to the NRA.

94.     Although Lockton KC promised and represented that it would review all aspects of the Insurance Program and ensure compliance with all applicable state regulatory laws, Lockton KC failed to do so.   NRA, Lockton, and the Insurance Program are now involved in state regulatory agency scrutiny in multiple jurisdictions, and are facing contentions and findings that NRA has violated applicable insurance laws and regulations based on actions recommended and approved by Lockton Affinity.

95.     Lockton KC also repeatedly breached its fiduciary duties and obligations to the NRA, including its duties of loyalty and to act in the best interest of the NRA.  Among other things, rather than acting to defend the NRA, and actively advocating to protect its interests in regulatory matters, Lockton KC breached its duties and put its own interests ahead of the NRA by proceeding to pursue and negotiate a settlement with DFS to protect itself.  It did so without full disclosure of material facts to the NRA, and irrespective of the detrimental impacts and effect of its undisclosed agreement on the NRA, its members, and the Insurance Program.

96.     In addition, on February 26, 2018, Lockton publicly tweeted that "Lockton Affinity has notified NRA that it will discontinue providing brokerage services for NRA-endorsed insurance programs under the terms of its contract."  Lockton KC took no action with respect to its affiliate, or the announcement.  Lockton KC continues to refuse to disclose all material facts concerning regulatory inquiries with state insurance regulators, or settlements it was negotiating on behalf of itself.

97.     Lockton KC also breached its duties by refusing to provide other basic information regarding the NRA and the Insurance Program despite its obligation to do so.  Among other things, Lockton KC refuses to provide its communications with insurance carriers regarding the Insurance Program, including any requests by Lockton for indemnification of NRA, or discussions or decisions or by carriers about terminating or not renewing NRA member insurance policies.  Lockton KC further refuses to reveal its internal discussions about the Insurance Program or its prior advice and approvals to the NRA.  In addition, other than Lockton's communications with the NRA directly, Lockton KC refuses to disclose its communications with any other person or entity about the NRA or matters related to the Insurance Program, including those Lockton KC has already produced to government regulators.

98.     Lockton KC also failed to protect the best interests of the NRA by not undertaking to obtain indemnification agreements for the NRA from insurance carriers, as required.

99.     In addition to the foregoing, after specifically acknowledging it previously reviewed and approved prior Insurance Program marketing materials, Lockton KC also breached its duties and obligations by now purporting to renounce its previous compliance guidance and directives, and has stated that the NRA may not rely on anything previously approved by Lockton KC.

100.     Lockton KC also breached its duties and obligations by failing and refusing to timely advise the NRA and provide direction regarding compliance matters following negotiations and agreements Lockton KC has purported to make with regulators.  Lockton Affinity then entered into the Consent Order, which contains misleading, detrimental statements pertaining to the NRA and enacts multiple restrictions which impair the NRA's interests, even with respect to insurance programs never alleged to violate any law or regulation.

101.     As a direct result of Lockton KC's breaches of its duties and obligations to the NRA, and other wrongful conduct, the NRA has suffered damages and losses, including attorneys' fees and expenses, which it is entitled to recover in an amount to be determined by the trier of fact.

**VII.**

**REQUEST FOR RELIEF**

WHEREFORE, for all the forgoing reasons, Plaintiff requests the Court enter judgment in favor of Plaintiff, and awarding Plaintiff

> a.     All damages, including its actual, compensatory, and consequential damages it is entitled to received and in an amount to be determined by the trier of fact;
>
> b.     Attorneys' fees and costs; and
>
> c.     Such other relief to which Plaintiff shows itself entitled that is just and proper.

Dated:  May 29, 2018          Respectfully submitted,


       /s/  Robert H. Cox
James W. Hundley (VA Bar No. 30723)
Robert H. Cox (VA Bar No. 33118)
Amy L. Bradley (VA Bar No. 80155)
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, VA  22182
jhundley@brigliahundley.com
rcox@brigliahundley.com
abradley@brigliahundley.com
Phone:  703-883-0880
Fax:  703-883-0899


William A. Brewer III (application for admission *Pro Hac Vice* to be filed)
Michael L. Smith (application for admission *Pro Hac Vice* to be filed)
BREWER, ATTORNEYS & COUNSELORS
750 Lexington Avenue, Floor 14
New York, New York 10022
wab@brewerattorneys.com
mls@brewerattorneys.com
Phone:  (212) 489-1400
Fax:  (212) 751-2849


*ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA*